# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 16-759

JOHNNELL DUNCAN

VERSUS

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, ET AL.**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2014-1800
HONORABLE SHARON D. WILSON, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## MARC T. AMY
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Marc T. Amy, D. Kent Savoie, and Van H. Kyzar, Judges.

**AFFIRMED.**

James E. Diaz, Jr.
Leah B. Guilbeau & Associates
4023 Ambassador Caffery, Suite 100
Lafayette, LA 70503
(337) 988-7240
COUNSEL FOR DEFENDANTS/APPELLANTS:
    State Farm Mutual Automobile Insurance Company
    Alexa A. Miller

Marcus L. Myers
Myers Law Firm, LLC
517 W. College Street
Lake Charles, LA 70605
(337) 602-9690
COUNSEL FOR PLAINTIFF/APPELLEE:
    Johnnell Duncan

**AMY, Judge.**

This matter stems from an automobile accident that occurred in a business parking lot. The plaintiff alleged that while traveling through an intersection, and after having stopped at a "stop line" painted on the pavement, her vehicle was struck by the defendant driver's vehicle. Citing various injuries, the plaintiff sought damages for herself and on behalf of her two minor children. Following a bench trial, the trial court found the defendant driver solely at fault and awarded general damages to the plaintiff and her children. The defendants appeal. For the following reasons, we affirm.

### Factual and Procedural Background

According to the record, on August 7, 2013, Johnnell Duncan was driving her vehicle in a southbound direction in the parking lot of the Southgate Shopping Center in Lake Charles. Her two minor children, Ja'Niya Golston and Ja'Maya Golston, were also in the vehicle. According to Ms. Duncan, as she approached an intersection in the parking lot located near FedEx and Accessory Zone, she encountered a stop line marked by the word "STOP" painted on the pavement. Ms. Duncan testified that she stopped at the stop line, looked in both directions, and, after ensuring that the intersection was clear, proceeded slowly through the intersection. However, while traveling through the intersection, her vehicle was struck by a vehicle driven by Alexa Miller,[1] which was traveling in an eastbound direction in the parking lot in an aisle perpendicular to Ms. Duncan's path. Gage Ritter, who explained that he was Ms. Miller's fiancé at the time of the accident and is now her husband, was a passenger in the Miller vehicle.

Ms. Duncan testified that she initially saw Ms. Miller's vehicle prior to the collision, when Ms. Duncan's vehicle was "in the middle" of the intersection, with

_____

[1] At trial, Ms. Miller stated her name as Alexa Miller Ritter. For the purposes of this opinion, we refer to her as "Ms. Miller" as alleged in the petition.

the "tip" of her vehicle being "right there where you go into the next set [of] cars, that lot." She added that at this time, she witnessed Ms. Miller holding an iPhone equipped with a pink OtterBox. She further stated that she could see Ms. Miller's vehicle "out of the corners of [her] eyes[,]" that Ms. Miller "was not driving slow [sic][,]" and that Ms. Miller "made a sharp turn" that "was really fast." When asked on cross examination if she witnessed Ms. Miller making this turn, Ms. Duncan admitted that she did not. However, she maintained that the only way Ms. Miller could have arrived at the intersection was by making a right turn from what Ms. Duncan referred to as the "fast lane," which runs parallel to the aisle in which Ms. Duncan's vehicle was traveling, and into the aisle perpendicular to Ms. Duncan's aisle. Ms. Duncan also suggested that Ms. Miller's vehicle must have been traveling faster than the parking lot's speed limit of fifteen miles per hour, as she testified that Ms. Miller's vehicle hit her vehicle "hard" and that "it actually drug" her vehicle.

Ms. Miller confirmed that, as deduced by Ms. Duncan, she made a right turn from the fast lane before approaching the intersection in which the accident occurred. However, contrary to Ms. Duncan's testimony, Ms. Miller and Mr. Ritter both testified that Ms. Miller's vehicle was traveling at a "normal parking lot speed" of seven or eight miles per hour. Ms. Miller maintained that as she approached the intersection, she was "looking straight ahead" and "being cautious[,] looking [at] each side." Mr. Ritter also testified that Ms. Miller was looking "straight" and making "normal parking lot driving head motions." Ms. Miller and Mr. Ritter both testified that Mr. Ritter noticed Ms. Duncan's vehicle before Ms. Miller did. According to Mr. Ritter, he first saw Ms. Duncan's vehicle "as soon as [they] got to where [he] could see down the lane," explaining that, due to parked cars obscuring the view, "you can't really see all the way down."

Mr. Ritter further alleged that he witnessed Ms. Duncan drive "straight through the stop line" without stopping, and he could not "even recall seeing her slow down." He also stated that Ms. Duncan's vehicle was going "maybe twice as fast" as Ms. Miller's vehicle, at a speed "[t]oo fast for the conditions of the parking lot that day." Ms. Miller and Mr. Ritter both alleged that he attempted to warn her of the impending collision, but Ms. Miller explained that she did not "even really have time to push [her] brakes" prior to impact. Ms. Miller further alleged that the force of the impact physically displaced her vehicle as well as Ms. Duncan's vehicle, such that both vehicles moved outward from their respective points of impact. When asked on cross examination whether she believed Ms. Duncan was at fault for the accident, Ms. Miller stated, "I agree[;] I do believe that if she would have stopped at the stop line, she would have seen me coming because I had the right-of-way."

Additionally, Ms. Miller and Mr. Ritter both denied that Ms. Miller was on her cell phone at the time of the accident, maintaining instead that they were having a conversation with each other. In response to this assertion, Ms. Duncan's counsel introduced certified records from AT&T purportedly indicating that a call was made from Ms. Miller's phone at 3:11 p.m. on the day of the accident. Having previously testified that the accident occurred at "[a]bout 3:15 in the afternoon[,]" Ms. Miller explained that she had called her father to inform him of the accident after it occurred and that she did not "really know" the "exact time" of the accident, as she had not been watching the clock. When asked on cross examination whether she had a pink OtterBox on her phone at the time of the accident, Ms. Miller responded, "I can't recall. I've always had a pink cover for my phone."

According to her medical records, Ms. Duncan was approximately 22 weeks pregnant on the date of the accident. She testified that upon impact, her steering wheel hit her stomach, which she described as having been "fairly large" at the time, and that she suffered from vaginal bleeding and contractions immediately following the accident. However, Mr. Ritter testified that Ms. Duncan did not appear to be in any pain, as he saw her jump up and down and kick the ground "in a fit" after inspecting the damage to her vehicle.

Ms. Duncan was admitted to Women and Children's Hospital the same day, where she allegedly learned that her unborn child's "heart rate was high" and that unspecified members of the hospital staff "were in fear that [she] may have to deliver him[,]" which made her feel "extremely afraid." Ms. Duncan was admitted to Women and Children's Hospital again on August 16, 2013, approximately one week after the accident, complaining that she had been having contractions accompanied by nausea, vomiting, and diarrhea since the day before that visit. She testified that prior to that visit, her contractions "were becoming very regular . . . about five minutes apart" and that they were "painful to the point [that she] couldn't walk." She further alleged that during this visit, she learned that her unborn child's heart rate was again elevated. Regarding this experience, she related that she was "afraid that [her] child would be damaged from the accident. And that he possibly wouldn't make it." According to Ms. Duncan, her son was born in good health in December 2013.

In addition to her own alleged injuries, Ms. Duncan testified that Ja'Maya, her younger daughter, had received stitches for a cut on her head shortly before the accident. Ja'Maya allegedly bumped her head upon impact, which caused the stitches, as well as the cut, to reopen. While Ms. Duncan asserted that both of her daughters were sitting in the back seat at the time of the accident, Mr. Ritter

4

testified that he believed Ja'Maya was sitting in the front seat without a seat belt, as he witnessed Ja'Maya hit her head on the dashboard and noticed that she was not wearing a seat belt when he approached Ms. Duncan's vehicle.

Both of Ms. Duncan's daughters visited the doctor approximately a week after the accident on August 15, 2013. The medical records from Ja'Maya's visit indicate that "[m]om reports no complaints but seems 'bothered by head,' picking at stitches." The medical records from Ja'Niya's visit indicate that she complained of "back pain 'when she moves'" but that she was "[f]eeling 'kinda good' [sic]."

Ms. Duncan subsequently filed suit, naming as defendants her own insurer, Safeway Insurance Company of Louisiana (Safeway), and Ms. Miller and her insurer, State Farm Mutual Automobile Insurance Company (State Farm), seeking damages on behalf of herself and her children, citing physical injury, mental pain and suffering, emotional anguish, loss of enjoyment of life, and economic loss. Following a determination that Safeway and Ms. Duncan had reached a valid settlement agreement, the trial court dismissed Safeway from the suit. Ms. Miller and State Farm filed a joint answer denying that Ms. Miller was at fault, arguing instead that Ms. Duncan was at fault "in proceeding past a stop line . . . in the immediate presence of traffic[,]" "in failing to accord the right of way of traffic[,]" and in "traveling at an excessive and unsafe speed for such a parking area."

After a bench trial, the trial court ruled in favor of Ms. Duncan, having found her to be an "exceptionally credible witness." During the ruling, the trial court stated the following:

> What she says makes sense to this Court that a young mother of two who is pregnant was driving at a safe speed through a parking lot with her kids in the car. I don't believe that she was driving exceptionally fast in this parking lot. I also do not believe that she got out [of] the vehicle being twenty-two weeks pregnant and jumped up and down in the parking lot. . . . I just don't think she did anything to put her fetus in jeopardy just based on the demeanor of the young woman who

testified before me and the emotion that I saw from her that I thought was genuine, I do not feel that she would have in anyway done anything that would have put her unborn son in jeopardy. The accident occurred because Ms. Miller, I believe, was driving at a speed that was not safe for that parking lot. . . . I'm pretty familiar with how people drive in and out of the parking lot, and I just think that Ms. Miller was caught up either in her phone conversation, or conversation with her now husband, and she was not paying attention. And I do believe that Ms. Duncan stopped as she should have and because she was not traveling at a fast speed, she was still in the intersection when Ms. Miller came and failed to see her. And she failed to see her based on testimony of her husband, because he actually saw her first and he wasn't driving. . . . I also think that just using this Court's common sense and basic knowledge of physics, the force of the accident, I think that the speed was traveling, just when I examine the photographs, was traveling with Ms. Miller, and that would have caused Ms. Duncan's vehicle to move in that direction. And I just think that had it occurred the other way, the accident would have been very different, especially if they were traveling at a speed of seven or eight miles an hour and she was driving exceptionally fast. The damage to the vehicles, in this Court's opinion, would not have been the way that the damage is. And that's why I'm finding that Ms. Miller is at fault.

The trial court also credited Ms. Duncan's testimony regarding her symptoms following the accident. Regarding the medical records from August 7, 2013, the trial court stated, "[A]ccording to her testimony, I didn't see it in the medical records, she was experiencing contractions at the time." The trial court also noted that the August 16, 2013 medical records indicated that "she was experiencing contractions again" and that she had mentioned the accident at that visit. However, the trial court determined that because no references to either the accident or her symptoms were included in Ms. Duncan's medical records dated September 17, 2013, "any pain and suffering she was experiencing had resolved by that time[.]"

Ultimately, the trial court awarded Ms. Duncan $7,500.00 for pain and suffering and $5,000.00 for emotional anguish, totaling $12,500.00. In awarding these sums, the trial court referenced Ms. Duncan's pregnancy and found "that the anguish was great[.]" Ja'Niya was awarded $1,500.00 for pain and suffering and

$1,000.00 for emotional anguish, totaling $2,500.00. Ja'Maya was awarded $2,500.00 for pain and suffering and $1,000.00 for emotional anguish, totaling $3,500.00.[2]

Ms. Miller and State Farm appeal, assigning as error that:

1. The trial court committed factual error in failing to find the plaintiff solely at fault.

2. Alternatively, the trial court committed factual error in failing to apportion fault between the drivers.

3. The trial court committed factual error as to the amount of damages awarded.

## Discussion

*Fault of the Plaintiff*

In their first assignment of error, appellants assert that Ms. Duncan was solely at fault for the accident and that the trial court erred in finding Ms. Miller solely at fault. On review, an appellate court considers a factfinder's determination under the manifestly erroneous or clearly wrong standard. *Brewer v. J.B. Hunt Transport, Inc.*, 09-1408 (La. 3/16/10), 35 So.3d 230. The supreme court has explained this standard as follows:

> To reverse a factfinder's determination under this standard of review, an appellate court must undertake a two-part inquiry: (1) the court must find from the record that a reasonable factual basis does not exist for the finding of the trier of fact; and (2) the court must further determine the record establishes the finding is clearly wrong. Ultimately, the issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. If the factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.

---

[2] The trial court declined to award damages for economic loss, as the medical bills incurred by Ms. Duncan and her children were paid in full by Medicaid, and no evidence of lost wages was presented.

Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous. However, where documents or objective evidence so contradict a witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the witness's story, a reviewing court may well find manifest error. Where such factors are not present, however, and a factfinder's determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.

*Id.* at 239-40 (citations omitted).

In support of their assertion that Ms. Duncan was solely at fault, appellants argue that Ms. Miller was the favored motorist in the intersection, as Ms. Duncan was bound by a stop line, while Ms. Miller was not. Thus, appellants contend, Ms. Duncan "had a legal duty to refrain from crossing if her movement created an immediate hazard to favored traffic." In support of this argument, appellants cite to La.R.S. 32:123, which, in relevant part, provides the following:

A. Preferential right of way at an intersection may be indicated by stop signs or yield signs.

B. Except when directed to proceed by a police officer or traffic-control signal, every driver and operator of a vehicle approaching a stop intersection indicated by a stop sign shall stop before entering the crosswalk on the near side at a clearly marked stop line, but if none, then at the point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersecting roadway before entering the intersection. After having stopped, the driver shall yield the right-of-way to all vehicles which have entered the intersection from another highway or which are approaching so closely on said highway as to constitute an immediate hazard.

However, jurisprudence indicates that the Highway Regulatory Act, which encompasses La.R.S. 32:123, is inapplicable to private parking lots. *See Johnson v. Smith*, 11-853 (La.App. 3 Cir. 3/14/12), 86 So.3d 874; *Chenevert v. Wal-Mart Stores, Inc.*, 02-1075 (La.App. 3 Cir. 2/5/03), 838 So.2d 922; *Gatheright v. State Farm Mut. Auto. Ins. Co.*, 352 So.2d 428 (La.App. 3 Cir. 1977). While the Highway Regulatory Act "may be of persuasive value in determining the degree of

care expected" of drivers in private parking lots, liability under these circumstances is determined by "general tort law[,]" with such drivers being held to a "due caution" standard. *Gatheright*, 352 So.2d at 431. Moreover, "a motorist can breach his duty of due caution if he travels at a fast pace in a parking lot with other traffic present and with his vision obstructed by parked cars and other objects." *Johnson*, 86 So.3d at 879.

For example, in *Roig v. Brooks*, 405 So.2d 1256, 1257 (La.App. 4 Cir. 1981), the plaintiff claimed, similar to Ms. Duncan, that she approached an intersection in a supermarket parking lot marked with the word "stop" on the pavement, "that she stopped in obedience to the painted stop sign, and that she looked both ways, saw nothing coming, and proceeded slowly across the intersection when her automobile was struck by the [defendant's] vehicle. Neither driver saw the other automobile until immediately prior to impact." Similar to Mr. Ritter's testimony, the defendant driver's husband testified that he saw the plaintiff's vehicle come "flying in front of" their vehicle, that the plaintiff failed to stop at the stop sign, and that the plaintiff was traveling "approximately 25 to 30 miles per hour." *Id*. at 1257-58. While the defendant driver admitted that she was traveling "between 20 and 25 miles per hour[,]" she argued that she had the right-of-way, citing La.R.S. 32:123. *Id*. at 1258. Upon determining that La.R.S. 32:123 was inapplicable, the reviewing court stated the following:

> Although no reasons for judgment were assigned by the trial judge, it is clear that he accepted plaintiff's version of the accident and rejected defendants'. It is clear also that the trial judge further concluded that the sole and proximate cause of the accident was the excessive rate of speed of the [defendant's] automobile through a crowded parking lot area where automobile [sic] move in different directions with drivers concentrating on locating parking spaces rather than on approaching automobiles. We cannot say, as we consider the testimony in this case, that the trial judge erred in his factual or legal conclusions.

*Id.* at 1258.

In addition to citing to La.R.S. 32:123, appellants also point to two diagrams of the parking lot that were presented at trial. Appellants argue that Mr. Ritter's depiction of the vehicles at the time of collision is more accurate than Ms. Duncan's, as the photographs of the damage to the vehicles demonstrate that the "collision could not have occurred with the vehicle of [Ms. Duncan] all the way across the travel aisle." Specifically, appellants state the following:

> The description of [Ms. Duncan] would include damage to the vehicle of Ms. Miller at the *right* front corner, instead of the left front corner, but that is inconsistent with the photographs. As the photographs clearly depict damage to the left front corner of Ms. Miller's vehicle, the description by [Ms. Duncan] in Exhibit D-1 would suggest that the damage of [Ms. Duncan's] car would have taken place at the front passenger side door. Once again, that is inconsistent with the photographs, which show no damage except for the right front corner.

Thus, appellants argue, because the vehicles clearly collided corner to corner, the front of Ms. Duncan's vehicle could not have been more than halfway through the intersection at the time of the crash, as that would have been the only opportunity for the two corners to meet.

Appellants further contend that because the front of Ms. Duncan's vehicle could have only been halfway through the intersection, it would have only traveled "approximately 10 feet" from the stop line before being struck by Ms. Miller's vehicle. Appellants also assert that "as Ms. Miller made that right turn, she was very close to the vehicle of [Ms. Duncan]; at most only two car lengths away[.]" Therefore, the appellants argue, Ms. Miller's vehicle "must have been in a position such that [Ms. Duncan] should have realized that a collision was imminent." According to appellants, "[o]ne of two conclusions can be reached. Either [Ms. Duncan] failed to stop at the STOP line in order to cause this accident, or she

pulled away from the STOP line when Ms. Miller's vehicle was extremely close. Either way [Ms. Duncan] was solely at fault."

In light of the standard of review, however, we find that this argument lacks merit. Simply, the interpretation of the photographic and diagrammatic evidence urged by Ms. Miller and State Farm is not so readily apparent on review so as to undermine the factual findings and credibility determinations made by the trial court. Notably, neither party presented expert testimony or opinion as to the reconstruction of the accident. The trial court instead resolved the case upon the parties' lay testimony, photographs, and diagrams upon which the parties explained their respective version of events. Having reviewed the record, we do not find that the evidence obviously undermines the trial court's credibility determination in favor of Ms. Duncan. Rather, we find that the record contains a reasonable factual basis to support the trial court's conclusion that Ms. Miller was solely at fault for the collision.

For these reasons, we find that this assignment of error lacks merit.

*Apportionment of Fault*

In their second assignment of error, appellants assert that the trial court erred in failing to apportion fault between Ms. Duncan and Ms. Miller. However, our conclusion that the trial court did not manifestly err in finding Ms. Miller solely at fault for the accident, as addressed above, renders this argument moot.

*Damages*

In their final assignment of error, Ms. Miller and State Farm argue that the trial court committed factual error when it determined the amount of damages awarded to Ms. Duncan and her children. Specifically, they argue that the amount of damages is "grossly excessive in light of the lack of medical evidence of the possibility of a causal connection between the accident and the claimed injuries"

11

and that "the medical records themselves indicate only an injury of approximately one week duration for each the plaintiff and her two minor daughters."

A determination that "an accident caused a person's injuries is a question of fact which should not be reversed on appeal absent manifest error." *Housley v. Cerise*, 579 So.2d 973, 979 (La.1991). In *Housley*, the supreme court stated the following:

> [A] claimant's disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition.

*Id*. at 980 (quoting *Lucas v. Ins. Co. of North America*, 342 So.2d 591, 596 (La.1977)). Moreover, "an appellate court should rarely disturb a general damage award[.]" *Miller v. Clout*, 03-91, p. 7 (La. 10/21/03), 857 So.2d 458, 463. Rather, "only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award." *Id*. at 463 (quoting *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1261 (La.1993)).

In the instant case, the record evidences the appellants' assertion that the amount of "evidence as to damages was sparse." The parties presented no medical expert testimony, and none of Ms. Duncan's medical records prior to the accident were introduced. Thus, the trial court was left to determine causation solely on Ms. Duncan's testimony and the medical records taken after the accident. Nonetheless, we do not find that the trial court's decision to credit Ms. Duncan's testimony regarding her symptoms was manifestly erroneous. Appellants assert that the hospital records from the date of the accident "do not even mention a

12

history of this accident taking place." However, as the trial court pointed out in its ruling, the records from that visit indicate that Ms. Duncan "reported to them that she had been in a motor vehicle accident." Regarding the medical records from her hospital visit on August 16, 2013, appellants argue that the "physical examination reflects that [Ms. Duncan's] abdomen was well relaxed and that no demonstrable contractions were palpable." On the contrary, as the trial court pointed out in its ruling, the nurse's notes from that visit indicate "that she was experiencing contractions again" and that she informed the nurse that "she had been in a vehicle accident." Additionally, appellants assert that the indication of Ms. Duncan's nausea, vomiting, and diarrhea in her medical records from this visit "suggests an infectious cause for complaints, as opposed to one involving trauma." However, there is nothing in the record to support this suggestion.

Moreover, appellants argue that Ja'Maya's medical record "finds the mother reporting no complaints of the child on this visit eight days after the accident" and that Ja'Maya's stitches were opened as a result of "negligence on the part of [Ms. Duncan] in failing to properly restrain her child[.]" However, although the trial court never explicitly stated as such, it clearly discredited Mr. Ritter's testimony that Ja'Maya was riding unrestrained in the front seat, as it assigned no percentage of fault to Ms. Duncan. As addressed above, the trial court's decision to credit Ms. Duncan's testimony was not manifestly erroneous. Additionally, appellants argue that the amount awarded to Ja'Niya was "excessive[,]" in that her medical records only indicate that she experienced "one week of vague back discomfort[.]" However, the trial court determined that this was "the normal kind of muscle pain that anyone would experience when they were in an accident[.]" In light of that determination, we do not find that its award of $1,500.00 for this injury is excessive.

For these reasons, we find that the record contains a reasonable factual basis for the trial court's determination that the injuries of Ms. Duncan and her children were caused by the accident. We also find that the damages awarded to Ms. Duncan and her children did not exceed what would be reasonable under the circumstances of this case. Accordingly, we find that this assignment of error lacks merit.

## DECREE

For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this proceeding are assigned to the appellants, State Farm Mutual Automobile Insurance Company and Alexa M. Miller.

**AFFIRMED.**